UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Elizabeth Baez
53 Sky View Drive
Farmington, NH 03865
             Plaintiff,

v.                                                    Docket No. _____

County of Strafford
Office of the Commissioners
d/b/a Strafford County Sheriff's Office
259 County Farm Road
Dover, NH 03820
             Defendant

## COMPLAINT AND REQUEST FOR JURY TRIAL

NOW COMES, Elizabeth Baez, Plaintiff, by and through her attorney, Law Office of

Leslie H. Johnson, PLLC, and complains against the County of Strafford, Office of the

Commissioners d/b/s Strafford County Sheriff's Office, Defendant, and in support thereof states

as follows:

### INTRODUCTION

### PLAINTIFF REQUESTS A TRIAL BY JURY

1.      Plaintiff, Elizabeth Baez, brings this action pursuant to the statutory and common

laws of the State of New Hampshire and the United States, particularly New Hampshire's Law

Against Discrimination, RSA 354-A, *et seq*. and Title VII, 42 U.S.C. §1981;  and the Americans

with Disabilities Act (ADA), 42 U.S.C. §12101 *et seq*., as amended (ADAAA, collectively

referred to herein as the "ADA"), for  discrimination, harassment and termination on the basis of

race, skin color, national origin and descent; for discrimination and termination based on

disability, perceived, regarded as and record of having; retaliation on the basis of complaints

about race discrimination; whistleblowing including termination; wrongful discharge; and false

1

imprisonment. Plaintiff seeks to recover all damages as allowed by law, and all equitable relief to which she is entitled.

## PARTIES

2. Ms. Elizabeth Baez (hereinafter, "Ms. Baez" or "Plaintiff"), is a resident of Farmington, Strafford County, New Hampshire, and was employed by Defendant County of Strafford, as a Deputy from on or about February 11, 2018 to January 19, 2024.

3. Defendant Strafford County operates the Strafford County Sheriff's Office, which is overseen by the Strafford County Commissioners. Both the County and Strafford County Sheriff's Office will hereinafter be referred to as "Defendant". The current Commissioners are George Maglaras, Chairman; Leslie Feliciano, Vice Chair; and, Sean Leavitt, Clerk. Defendant has 15 or more employees during all relevant periods for jurisdictional purposes.

4. Under the theories of *respondeat superior* and/or vicarious liability Defendant is responsible for all actions of its employees, named or unnamed herein, who at all times were acting within the scope of their employment, as well as their failures to act, and are also liable for its own actions and failures to act.

## JURISDICTION & VENUE

5. Venue and jurisdiction are proper as Plaintiff worked for Defendant in Strafford County, New Hampshire, and the unlawful employment acts complained of were committed there.

6. This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and §1343(4) for Plaintiff's claims under Title VII, 42 U.S.C 2000e et seq. the Civil Rights Act of 1964, as amended, 42 U.S.C. § 1981 for race and national origin harassment and discrimination, as well as for disability discrimination under the ADA. This Court has

supplemental jurisdiction under 28 U.S.C. § 1367 over the state law claims of discrimination, violation of the Whistleblower's Protection Act, wrongful termination and false imprisonment.

7.     On or about January 17, 2024, Ms. Baez timely filed a Charge of Discrimination against Defendant under New Hampshire Law and Federal Laws directly with the New Hampshire Commission for Human Rights ("NHCHR"), within 180 days of the last discriminatory act. (EDRCNO(R) 0099-24 / 16D-2024-00090). On January 21, 2026 the EEOC issued a Notice of Right to Sue, and this Complaint is filed within 90 days of receipt thereof, and well within three years of the last discriminatory act.

## STATEMENT OF FACTS

8.     Ms. Baez was employed by Defendant as a Deputy from on or about February 11, 2018 to January 19, 2024. Ms. Baez is a Hispanic female, with caramel colored skin. Her national origin, and descent, is the Dominican Republic. Spanish is her native language, and English is her second language, which she speaks fluently though with an accent.

9.     Ms. Baez is a person with a record of a disability, regarded as having a disability and/or with a disability, who is entitled to protection under RSA 354-A, et seq., New Hampshire's Law Against Discrimination, and the Americans with Disabilities Act (ADA), 42 USC §12101, *et seq*., as amended, including the ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 ("ADAAA" or "amended Act")(collectively referred to as the "ADA"). Ms. Baez's disability includes chronic post-traumatic stress disorder and anxiety.

10.     Ms. Baez was falsely imprisoned by her employer when she was told she must report to a hospital under her employer's police escort/patrol car for a psychiatric evaluation and waited for her to drive her back to work, having at that time regarded her as having a mental disability, although she had made no such claim.

3

11.    Ms. Baez was also discriminated against on the basis of her race[1], including color, national origin and descent, and retaliated against for objecting to and reporting said discrimination.  She was entitled to protection under NH RSA 354-A, et seq and Title VII, for discrimination, harassment/hostile work environment, and retaliation on the basis of race, color, descent, and/or national origin, which was also contrary to 42 U.S.C. §1981.

12.    In addition, Ms. Baez was discriminated against due to her whistleblowing, contrary to the Whistleblowers' Protection Act (RSA 275-E, *et seq*.).

13.    On or about May 3, 2019, Sgt. B. Scott, who was a supervisor of Ms. Baez's, began harassing her Baez on the basis of her race and national origin, including her Spanish accent. During this particular event, Sgt. Scott was attempting to open a door to the sally port before the other door had closed.  Ms. Baez informed him he had to wait for the other door to close first before attempting to enter. Sgt. Scott responded, "Speak English, I don't understand what you're saying".  Obviously, Ms. Baez was speaking English.

14.    Sgt. Scott's comment was made in front of an inmate who was laughing at the comment. Sgt. Scott's comment should never have occurred, but especially in front of an inmate as it was imperative that inmates never see any disrespect amongst those in authority over them as that could cause an inmate to disrespect Ms. Baez, thus endangering her safety.

15.    However, not only did Sgt. Scott make that comment, but he repeatedly made the same and similar comments to Ms. Baez throughout her employment with Defendant.

16.    On or about May 7, 2019, Ms. Baez reported Sgt. Scott's racist statements to Lt. M. Brave.  Later that day Sgt. Scott told Ms. Baez he was just joking. Ms. Baez told him it was

---

[1] Henceforth, in this document, "race" includes national origin, descent and skin color.

4

one thing to joke without inmates present vs. with inmates present, and that because he made the inappropriate comment with an inmate present, it could cause the inmate to disrespect Ms. Baez.

17.    In reply, Sgt. Scott threatened Ms. Baez he should write her up, claiming she should have come to him about her complaint vs. filing a report with Lt. Brave.

18.    Defendant took no prompt remedial action, thus emboldening Sgt Scott to mimic Ms. Baez's accent on a regular basis, occurring at least 3-4 times per week throughout her employment.

19.    In January 2020, Captain J. Payne informed Ms. Baez that the US Marshalls' had told him that Ms. Baez was doing a good job. Ms. Baez relayed this to Deputy S. Tingle, a coworker. Instead of congratulating her, Deputy Tingle became upset and stated it was because "you are Spanish and beautiful", and that he had been with Defendant longer than Ms. Baez and had never been recognized by the US Marshalls.

20.    The regular and pervasive mimicking of Ms. Baez's speech continued up to and past January 2, 2022, when she was assigned to a new division with the title of Community Services Deputy, which included having her own office.

21.    Around February 2023, Ms. Baez filed two reports, each one week from the other, with Sheriff Brave (who had been promoted to Sheriff in approximately 2021), relating to misconduct by Lt. Pardy (a supervisor but not Ms. Baez's direct supervisor). Both times it was because Ms. Baez witnessed Lt. Pardy using a patrol vehicle when he was off duty, a violation. Sheriff Brave assigned the investigation to Major Bourque.

22.    Approximately two days after Major Bourque was assigned to the investigation, she was called into the Sheriff's conference room and met with Sheriff Brave and Major

Bourque. Sheriff Brave informed Ms. Baez that Major Bourque found her complaints to be unfounded; then he left the room.

23.     After the Sheriff left, Major Bourque approached Ms. Baez and threatened her by saying, "[w]ho the hell do you think you are, playing with people's jobs and retirements? Don't ever do that again." Ms. Baez took that as a clear threat to her job and physical safety.

24.     Due to this inappropriate threat, Ms. Baez reported Major Bourque's actions to the Chief who said he would talk with both Sheriff Brave and Major Bourque.  Ms. Baez never heard anything further, and it appears there was no investigation or disciplinary action taken.

25.     From that time forward, however, Major Bourque began treating Ms. Baez in an intimidating and hostile manner.  Major Bourque would ignore her, even when she said hello to him.  Later she learned he was the one that advised the Sheriff to take her off the list when the position of Sargeant was posted.

26.     On or about June 29, 2023, Sheriff Brave promoted Ms. Baez from the rank of Deputy to Sargeant effective July 2, 2023.

27.     Deputy J. Croteau remarked to Ms. Baez about her promotion, "I guess you have to speak Spanish here to get promoted." Ms. Baez believes Deputy T. McKnight and Deputy Wright were present to hear the comment. Later that day, Ms. Baez was approached by two other deputies, M. Zabkar and J. Wright, who told her they also heard Deputy Croteau make the same inappropriate comment to them about her.

28.     Ms. Baez immediately reported Deputy Croteau's discriminatory comment to then Chief Deputy McGivern, which conversation was expected to be confidential, at least until an investigation could occur.  However, Deputy Croteau approached Ms. Baez shortly thereafter denying she ever made the comment.

29.     Clearly, Ms. Baez's promotion upset many of the other deputies as well as Major Bourque because, on or about July 6, 2023, the Union filed a grievance regarding her promotion.

30.     Due to the grievance, on August 3, 2023, Sheriff Brave rescinded Ms. Baez's promotion. Ms. Baez believes her demotion was due to her race and in retaliation for having previously reported both Lt. Pardy and Major Bourque (misuse of property and discrimination respectively), as she was clearly qualified for the promotion.  Deputy Croteau (female, white, no different national origin or accent) was promoted to this position on or about January 2024, but she was less qualified than Ms. Baez.

31.     Due to the constant discrimination and harassment she was experiencing, on or about July 5, 2023, Ms. Baez began seeing a mental health therapist and was diagnosed with Post-Traumatic Stress Disorder (PTSD).  However, Ms. Baez did not disclose this to anyone at work.

32.     Around the end of July 2023, Ms. Baez spoke with Chief J. McGivern regarding the discriminatory statement Deputy Croteau had made about her.

33.     On or about August 16, 2023, Municipal Resources, Inc., was brought in by Defendant to investigate the discrimination. Although Ms. Baez was interviewed during the investigation, to the best of Ms. Baez's knowledge nothing ever came of it; in fact she was never informed of the result.

34.     On or about August 16, 2023, Ms. Baez took time off for bereavement after the death of her Father, returning to work on or about August 23, 2023.

35.     When Ms. Baez reported to work on August 23, 2023, Major Bourque instructed her to report to HR to meet with him, McGivern and HR. During the meeting McGivern told her she was being demoted and stripped of her title as Community Services Deputy. She was told

they were eliminating the position.  She was demoted to inmate transports and patrol, a position she held when she was first hired a few years before, basically an entry position.

36.  Due to the demotion, Ms. Baez had to clean out her office, return her cruiser, and her pay was reduced by approximately $5.00 per hour. This was an apparent attempt to force her to quit.

37.  Ms. Baez believes her demotion was spear-headed by Major Bourque as a form of retaliation for her filing the two reports against Lt. Pardy and then reporting Major Bourque for intimidation in February 2023, as well as her other complaints of discrimination.

38.  On or about August 22, 2023, Sheriff Brave was placed on administrative leave with Chief Deputy J. McGivern acting as interim Chief and Major S. Bourque being promoted to 2nd in command.

39.  On or about August 24, 2023, Ms. Baez emailed Chief McGivern and stated her desire to resign due to the ongoing discrimination and retaliation, and that it was not fair for her to be demoted, yet a second time. The following day, August 25, 2023, she emailed Chief McGivern rescinding her resignation and spoke with him later that day.

40.  However, on or about August 28, 2023, Chief McGivern texted Ms. Baez not to report to work that day as he would be meeting with a legal advisor and HR. Therefore, Ms. Baez did not return to work until August 29, 2023.

41.  Following Ms. Baez's return to work, and having been demoted to transport and patrol, she then reported to Sgt. P. Levine, who immediately began harassing her.

42.  Sgt. Levine micromanaged Ms. Baez's work, including watching her on cameras during court, and sending her texts or emails about almost everything she was doing. He claimed she wrote her reports incorrectly even though Ms. Baez wrote them the same way other deputies

did who were not being scrutinized, and the same way she had always written her reports in her prior positions with no serious complaints or adverse consequences.

43.    In addition, no one in the department would talk with Ms. Baez, which she believes was because they learned about her whistleblowing, and complaints about discrimination.

44.    Also, both Sgt. Levine and Lt. Scott told Ms. Baez she "did not belong in law enforcement" .

45.    Ms. Baez's accent was also regularly mimicked on the radio to dispatch, especially by Deputy Tingle at least 1-2 times per week, but also by Deputy M. Zabkar approximately once per week.  Although Ms. Baez repeatedly asked them to stop, they did not.

46.    As a result of the continued harassment by Sgt. Levine, the ostracizing by the department she was now assigned to, as well as all the other discrimination, harassment, and retaliation she was facing, Ms. Baez felt isolated and did not believe her coworkers had her back should she be placed in a compromising position with an inmate or while on patrol.

47.    In late August/September 2023, Ms. Baez was assigned to handle an incident where Sgt. Levine had little experience, in patrol and inmate transport.

48.    Prior to this time, Ms. Baez had no write-ups or written disciplinary actions. Ms. Baez was sent over to investigate an incident that occurred at a Riverside home. After the investigation, Sgt. Levine told Ms. Baez the report she drafted was not done correctly, that she needed to rewrite it, and he instructed other deputies and supervisors not to help her with the report.

49.    Sgt. Levine made Ms. Baez repeatedly rewrite the report in his presence. This was another form of harassment and retaliation due to both her complaints of discrimination and

9

whistleblowing. It was clear Defendant was trying to make her quit or was trying to set up a reason to fire her.

50. On or about September 19, 2023, Ms. Baez was at the courthouse for a transport. While the inmate was in a room meeting with his attorney, Ms. Baez asked the senior bailiff if he would watch the room while she used the bathroom. Lt. Scott was apparently watching her on the cameras in the building and noted she used the bathroom, and issued a warning.  Upon information and belief bailiffs are allowed to use a bathroom while on duty and having proper coverage. Therefore, this warning was just further harassment and discrimination, as well as retaliatory based on her whistleblowing.

51. Around the middle to end of October 2023, Ms. Baez spoke with Lt. B. Scott about her concerns as noted above including, but not limited to, micromanagement and being ostracized by her coworkers and superiors, which was creating excessive stress.

52. Lt. Scott instructed Ms. Baez to go home, but stated he wanted to alert the higher-ups to let them know first. Therefore, Ms. Baez waited for Lt. Scott to return.

53. When Lt. Scott returned, he informed Ms. Baez that he had just spoken with Major Bourque and that Major Bourque was requiring her to go to hospital for a mental evaluation claiming she was suicidal. Lt. Scott assured her she would be back to work the following Monday.

54. Defendant regarded Ms. Baez as having a disability when mandating a psychological evaluation, although she did have a disability and a record of a disability.

55. Ms. Baez was shocked at this requirement, as this was completely out of the blue, and told Lt. Scott she did not need to go to the hospital as she knew she was not suicidal, however, Investigator (Deputy) O. Carlson informed her that she had no choice.

56.     Lt. Scott took Ms. Baez's firearm and Ms. Baez was taken to the hospital by Lt. Scott and Investigator Carlson against her will, where she was cleared by the psychiatrist.   This constituted false imprisonment.

57.     Ms. Baez did as she was mandated by the employer's employees who were armed, and went to the hospital.

58.     While Lt. Scott and Investigator Carlson were not in the room during the examination with the psychiatrist (telehealth appointment), when it ended Lt. Scott opened the exam door and he, Investigator Carlson and the nurse came in with the nurse continuing her conversation with Lt. Scott and Investigator Carlson that she was not suicidal, just grieving. Ms. Baez had not approved any communication by her medical providers to these representatives of Defendant.

59.     This discussion occurred in the exam room with the door open. Ms. Baez then exited the building with Lt. Scott and Investigator Carlson and traveled in the cruiser back to the station, which ride was silent.  When the group arrived at the parking lot Lt. Scott said, "We will be in touch on Monday", and she was told to go home.

60.     As noted above, Ms. Baez did not have a good working relationship with Major Bourque after filing her February 2023 reports, and believed he required a mental health evaluation, claiming she was suicidal, as another form of harassment and retaliation, in an effort to get rid of her.

61.     Rather than Ms. Baez returning to work that Monday, October 23, 2023, she was instead placed on Administrative Leave pending a "fitness for duty" evaluation, even after already being cleared by the hospital psychiatrist.

62. After no contact for almost two full weeks, on November 6, 2023, Ms. Baez received an email from Human Resources, restating she could not return to work as they wanted her to be evaluated by a doctor of their choosing to confirm she was fit for duty and not a risk to herself or others.

63. The email also directed Ms. Baez to sign up for short-term disability, when, in fact, Defendant should have continued to provide her with paid administrative leave while she waited to be seen by Defendant's doctor. No evaluation was ever scheduled.

64. Ms. Baez spoke with her Union Representative, Stephen Arnold, who told her she could not sign up for short-term disability because she was not sick, which Ms. Baez concurred with.  Ms. Baez then contacted Jill in HR and relayed what Mr. Arnold had stated.

65. Ms. Baez did not receive any pay for three months and was given no explanation, while waiting for the further evaluation to be scheduled by Defendant. Therefore, Ms. Baez had no choice but have the Union file a grievance on or about December 21, 2023 for non-payment of wages while on administrative leave. After the grievance was filed, Ms. Baez finally received the backpay owed to her, and paid weekly thereafter until her termination.

66. In the interim, rather than returning her to work or scheduling her with Defendant's doctor, Defendants made three offers to her in which they would agree to reimburse her back wages; however, all three offers were contingent upon her resigning and agreeing not to file any complaints against Defendant.

67. Ms. Baez refused all three offers as she knew she was fit for duty and wished to return to work, and because she had no intention of foregoing her legal rights; the insistence that she do so constitutes discrimination and retaliation.

68.    Ms. Baez was not contacted by Defendant until on or about January 18, 2024, at approximately 8:30 PM, when an officer from the Farmington Police Department arrived at Ms. Baez's residence. The officer stated, "Baez, I am checking on your well-being." He then explained that the Sheriff's Office had been trying to contact her all day but had been unable to reach her.

69.    Ms. Baez informed the officer that her personal phone had not rung once the entire day and that her duty cell phone had been shut off since the start of her forced administrative leave, now more than 2.5 months ago.

70.    The officer mentioned that a person named Jen had called the police department, (purportedly) worried about Ms. Baez. Ms. Baez believes Jen was Captain Payne. Since the beginning of Ms. Baez's forced absence, the Sheriff's Department had never checked on her well-being or shown any concern for her, and doing so by sending a police officer to her door was further harassment and retaliation.

71.    The officer then informed Ms. Baez that Captain Payne asked him to inform Ms. Baez that there was a meeting at the Commissioner's Office on January 19, 2024, and she needed to attend. Defendant sending an officer to her home to relay a message, instead of simply calling her on her personal cell phone, left Ms. Baez feeling harassed and overwhelmed with anxiety, and with no time to consult with the Union for a representative to be present with her, as she was entitled to.

72.    Clearly Defendant had no concern about Ms. Baez's well-being, or they would have checked on her sooner. Instead, Defendant was more interested in harassing her by informing Ms. Baez about the January 19, 2024 meeting to occur while she was on forced leave, that they knew was being held to terminate her employment, and purposefully providing notice

in an intimidating way and without sufficient notice to allow Ms. Baez time to arrange for Union Representation.

73.     Ms. Baez was informed of the January 19, 2024 meeting with less than 24 hours' notice.

74.     In fact, on January 19, 2024, Ms. Baez was terminated from her employment. The pretextual reason given in her termination letter was: "…neglect of duty, negligence, inefficiency, and clear evidence of unfitness in your part to perform duties of a Deputy Sheriff."

75.     Ms. Baez was retaliated against by Defendant due to reporting various wrongdoings by Defendant including acts perpetrated by others that were against policy and/or the law, and due to discrimination, and in retaliation for complaining about both.

76.     All of these actions are contrary to NH RSA 354-A, et seq., Title VII, 42 U.S.C. §1981, the ADA, the Whistleblowers' Protection Act NH RSA 275-E, et seq., and constituted wrongful discharge, with parts constituting false imprisonment.

77.     The actions by Defendant as described herein were intentional, malicious, willful, done with deliberate indifference, were knowing, egregious, oppressive, wanton, reckless, negligent and/or grossly negligent.

78.     Ms. Baez has suffered damages due to the actions of Defendant including, but not limited to, lost wages and benefits (past and future), liberal/enhanced compensatory damages (common law and statutory), punitive damages, emotional distress, embarrassment, humiliation, aggravation, anxiety, medical treatment and expenses, physical pain and suffering, loss of enjoyment of life, loss of reputation, attorney fees, costs, all pre-judgment interest, and an amount to compensate for any negative tax consequences that result from any judgment or decision.

14

79. Ms. Baez claims all damages available to her under the law, and for all equitable relief to which she is entitled, for each of the claims listed below.

**COUNT I**
**RSA 354-A AND TITLE VII**
**RACE DISCRIMINATION**
**HOSTILE ENVIRONMENT/HARASSMENT**
**(Race, skin color, national origin and descent)**

80. Ms. Baez incorporates herein each and every allegation raised elsewhere in the Complaint as if fully set forth herein and further states as follows:

81. Ms. Baez asserts that the treatment she received, as described above (hostile environment and harassment, discrimination and retaliation) was because of her race, color descent and national origin, all contrary to, and in violation of, NH RSA 354-A and Title VII, and which also violates 42 U.S.C. § 1981.

82. Ms. Baez's race was at least a but for cause of said discrimination, harassment and retaliation.

83. For example, Ms. Baez's accent was mimicked 3-4 times per week throughout over four years of her employment, totaling roughly @728 times (208 x. 3.5). In addition, discriminatory racial statements were made. Other allegations above are also incorporated herein.

84. Said harassment was based on race was severe and/or pervasive, such that no reasonable person would be expected to endure same, and in fact at one time Ms. Baez tendered her resignation before rescinding it.

85. Defendant knew, or should have known, that its actions described herein were illegal.

86. Defendant's actions were contrary to the law and done knowingly, maliciously,

15

with reckless indifference and were egregious and wanton, thus justifying an award of enhanced/liberal compensatory damages, and punitive damages.

87.     Said race discrimination/harassment, has caused Ms. Baez damages as set forth elsewhere herein, and she claims all damages as allowed by law.

88.     Ms. Baez also claims all equitable relief to which she may be entitled.

**COUNT II**
**RSA 354-A, et seq. and TITLE VII**
**RACE DISCRIMINATION INCLUDING TERMINATION**
**(Race, skin color, national origin and descent)**

89.     Ms. Baez incorporates herein each and every allegation raised elsewhere in the Complaint as if fully set forth herein and further states as follows:

90.     Ms. Baez asserts that the treatment she received, as described above was discrimination based on race, color, descent and national origin, all contrary to NH RSA 354-A and Title VII.

91.     Ms. Baez's race, color, descent and national origin were each a but for causes of the discrimination she experienced including, but not limited to, her demotions, suspensions, and termination from employment, as well as the harassment described above.

92.     In addition, Ms. Baez's race was also a causal factor in the retaliation described in Count V below, which is incorporated herein by reference.  While the laws against disability discrimination constitute an independent statutory basis for liability, Ms. Baez's race also was a but for reason for the actions described in Count VI below.

93.     Defendant knew, or should have known, that its actions described herein were illegal. Defendant's actions were contrary to the law and done knowingly, maliciously, with reckless indifference and were egregious and wanton, thus justifying an award of enhanced/liberal compensatory damages and punitive damages.

16

94.     Said race discrimination has caused Ms. Baez damages as set forth elsewhere herein, and she claims all damages as allowed by law.

95.     Ms. Baez also claims all equitable relief to which she may be entitled.

## COUNT III
## VIOLATION OF CIVIL RIGHTS
## RACE DISCRIMINATION INCLUDING TERMINATION
### (Race, skin color, national origin and descent)
### 42 U.S.C. § 1981

96.     Ms. Baez incorporates herein each and every allegation raised elsewhere in the Complaint as if fully set forth herein and further states as follows:

97.     Ms. Baez was discriminated against, harassed, and retaliated against, because of her national origin, race, color and descent.

98.     Ms. Baez asserts that the treatment she received, as described above including harassment and discrimination was contrary to 42 U.S.C. § 1981.

99.     Said violations caused Ms. Baez damages as set forth elsewhere herein, and she claims all damages as allowed by law.

100.    Ms. Baez also claims all equitable relief to which she may be entitled.

## COUNT IV
## RSA 354-A, et seq. and TITLE VII
## RACE DISCRIMINATION – RETALIATION
### (Race, skin color, national origin and descent)

101.    Ms. Baez incorporates herein each and every allegation raised elsewhere in the Complaint as if fully set forth herein and further states as follows:

102.    Ms. Baez repeatedly complained about the race discrimination, including the mimicking of her accent, being told she was only promoted because of her nationality, being demoted, being forced to undergo a psychological evaluation, being suspended and fired, and treated as otherwise described above.

17

103. Said retaliation caused Ms. Baez damages as set forth elsewhere herein, and she claims all damages as allowed by law.

104. Ms. Baez also claims all equitable relief to which she may be entitled.

**COUNT V**
**NH RSA 354-A and**
**AMERICANS WITH DISABILITIES ACT (42 U.S.C. § 12101 et seq.),**
**as amended (ADAAA)**
**DISABILITY DISCRIMINATION INCLUDING TERMINATION**

105. Ms. Baez incorporates herein each and every allegation raised elsewhere in the Complaint as if fully set forth herein and further states as follows:

106. Ms. Baez asserts that the treatment she received, as described above, was both because of her race, and because of Defendant perceiving her as or regarding her as disabled, although she still had a disability of PTSD, as well as anxiety, and a record thereof.

107. Ms. Baez had not disclosed she suffered from PTSD, which was related to the discrimination and retaliation at work.

108. However, Defendant perceived her as having a disability, and/or was just purely retaliating against her based on her complaints of race discrimination and/ or because of her race, and took the extraordinary step of forcing her to undergo a psychological evaluation for no reason which included falsely imprisoning her and transporting her to the hospital against her will.

109. Then, when the hospital psychiatrist cleared her, indicating she was not suicidal, she was almost immediately suspended from work without pay and for no stated reason.

110. Defendant then told Ms. Baez it required another exam, a "fitness for duty" exam, which it never scheduled, continued the suspension without pay, and further tried to make her quit three times by offering her the pack pay she was already due under the law but only if she agreed to resign and promise not to sue them for the violation of her rights.

18

111.    When Ms. Baez refused to give up her rights to sue Defendant for race discrimination, among other things, Defendant continued to withhold her pay, and then fired her anyway.

112.    Ms. Baez was terminated on January 19, 2024, with her disability and her race, both being a but for factor in these actions.  These two statutorily protected categories intersect, with the discrimination being related to both.

113.    Ms. Baez was discriminated against based on her disability or record of disability, and/or Defendant regarding her as disabled.

114.    At all times Ms. Baez was able to perform the essential functions of her job with Defendant, without any reasonable accommodation.

115.    Said discrimination against Ms. Baez had caused her damages as set forth elsewhere herein, and she claims all damages as allowed by law.

116.    Ms. Baez also claims all equitable relief to which she may be entitled.

**COUNT VI**
**NH RSA 275-E, et seq.**
**WHISTLEBLOWER'S PROTECTION ACT**

117.    Ms. Baez incorporates herein each and every allegation raised elsewhere in the Complaint as if fully set forth herein and further states as follows:

118.    Ms. Baez was harassed, discriminated against and terminated, because she reported various instances of harassment and discrimination, as set forth in the above paragraphs.

119.    Ms. Baez also reported a deputy for using a cruiser while off duty, and then was harassed for said report.

120.    Because of Ms. Baez's reports, which constituted whistleblowing, she was further harassed and retaliated against by Defendant and its employees, which was in violation of and

contrary to RSA 275-E et seq., including but not limited to RSA 275-E:2.

121.    Said violation of the Whistleblowers' Protection caused Ms. Baez damages as set forth elsewhere herein, and she claims all damages as allowed by law.

122.    Ms. Baez also claims all equitable relief to which she may be entitled.

## COUNT VII
## WRONGFUL DISCHARGE

123.    Ms. Baez incorporates herein each and every allegation raised elsewhere in the Complaint as if fully set forth herein and further states as follows:

124.    Ms. Baez reported various violations of laws, rules, and regulations to Defendant as described above, including the anti-discrimination laws, RSA 354-A, Title VII and the ADA, as well as theft of services by misuse of the cruiser.

125.    Public policy supported her making of these complaints.

126.    Harassment, discrimination and retaliation against Ms. Baez was in part due to these complaints.

127.    Defendant terminated Ms. Baez due to her complaints which were in furtherance of public policies, which was intentional, malicious, willful, done with deliberate indifference, was knowing, oppressive, wanton, reckless, negligent and/or grossly negligent.

128.    Defendant's termination of Ms. Baez constitutes a wrongful discharge.

129.    Ms. Baez claims said wrongful discharge caused her damages as set forth elsewhere herein, and she claims all damages as allowed by law.

130.    Ms. Baez also claims all equitable relief to which she may be entitled.

20

## COUNT VIII
## FALSE IMPRISONMENT

131. Ms. Baez incorporates herein each and every allegation raised elsewhere in the Complaint as if fully set forth herein and further states as follows:

132. Around the end of October 2023, as described above, Ms. Baez was falsely imprisoned by Defendant.

133. As a description of false imprisonment, NH RSA 633:3, a criminal statute defines false imprisonment when one "knowingly confines another unlawfully, as defined in RSA 633:2, so as to interfere substantially with his physical movement". This is when there is a substantial interference with their physical movement, with the intent to confine, lack of consent, lack of consent, lack of legal authority, and the victim's awareness of the confinement.

134. This applies here, where with no valid legal authority to do so, Defendant falsely imprisoned Ms. Baez by telling her they were taking her to the hospital for a psychiatric evaluation, told her she had no choice, took her work weapon/gun, maintained their own armed status, told her she had to get in their car, which they then used to take her to the hospital, talked to her nurse without consent, and put her back in their car and returned her to the Department.

135. Ms. Baez knew she was confined and transported against her will, and reasonably became upset at said confinement and forced medical examination, all of which caused her increased anxiety and emotional turmoil.

136. Said false imprisonment is also part of the harassment to which Ms. Baez was subjected to by Defendant.

137. Ms. Baez claims said false imprisonment caused her damages as set forth elsewhere herein, and she claims all damages as allowed by law.

138. Ms. Baez also claims all equitable relief to which she may be entitled.

21

WHEREFORE Plaintiff, Ms. Baez, respectfully prays this Honorable Court and/or a jury order the following relief against Defendant, as requested above under each Count as appropriate:

A.    Back wages, together with lost fringe benefits and any other benefits, including increased retirement benefits, which Plaintiff would have earned had he not been terminated;

B.    Future wages, fringe benefits, loss of earning capacity and other benefits;

C.    Enhanced/liberal compensatory damages, both statutory and common law;

D.    Punitive damages;

E.    An amount to be awarded by the Court to make up for any adverse tax consequences due to any judgment or award;

F.    All damages which are available under the above-cited laws;

G.    All available pre-judgment and post-judgment interest on Plaintiff's recovery and on the attorneys' fees to be recovered;

H.    Reasonable attorneys' fees, interest and costs;

I.    All damages as set forth above;

J.    All equitable relief which may be available, and any other appropriate relief; and,

K.    Such other and further relief as is just and equitable.

Respectfully submitted,
**ELIZABETH BAEZ, Plaintiff**
By her attorney

Dated: April 20, 2026                          /s/ LESLIE H. JOHNSON
Leslie H. Johnson, Esquire - #5545
LAW OFFICE OF LESLIE H. JOHNSON, PLLC
PO Box 265
Center Sandwich NH 03227
603.284.6600
leslie@lesliejohnsonlaw.com